**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ROCHELLE WARD, | ) | |
| | ) | CASE NO.   1:09-cv-00500 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Rochelle Ward ("Ward") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Wards's claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, this Court AFFIRMS the final decision of the Commissioner.

## I. Procedural History

On August 12, 2005, Ward filed an application for POD, DIB, and SSI alleging a disability onset date of November 19, 2004, and claiming that she was disabled due to bipolar disorder. Her application was denied both initially and upon reconsideration. Ward timely requested an administrative hearing.

On May 8, 2008, an Administrative Law Judge ("ALJ") held a hearing during which Ward, represented by counsel, testified. Bruce Holderead testified as the vocational expert ("VE"). On May 9, 2008, the ALJ found Ward was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

On appeal, Ward claims the ALJ erred by: (1) improperly assessing her credibility; and (2) finding that she retained the residual functional capacity for light work.

## II. Evidence

### *Personal and Vocational Evidence*

Born on October 10, 1969, and age thirty-eight (38) at the time of her administrative hearing, Ward is a "younger person" under social security regulations. *See* 20 C.F.R. § 404.1563(C) & 416.963(C). Ward has a ninth grade education and past relevant work as a housekeeper.

### *Medical Evidence*

1. *Physical Impairments*

On November 3, 2004, Ward received treatment at Euclid Hospital for an exacerbation of her asthma. (Tr. 307-16.) She was out of her inhaler medication at the time. *Id*.

On June 30, 2005, Ward again reported to the Euclid Hospital Emergency Room ("ER") with complaints of dizziness. (Tr 258.) It was noted that she had a history of hypertension and atrial fibrillation. (Tr. 259.) At the time, she had not taken her hypertension medications for two months. (Tr. 262.)

On September 4, 2005, Ward again reported to the ER complaining about her asthma. (Tr. 238-257.) A chest x-ray revealed a small, left pleural effusion and bi-basilar atelectasis or evolving infiltrates. (Tr. 249).

On November 29, 2005, Wilfredo Paras, M.D., conducted a consultative examination. (Tr. 137-43.) Ward told Dr. Paras that she had a history of asthma since childhood, used Advair and Combivent inhalers daily, and used an Albuteral inhaler when needed. (Tr. 137.) Her last asthma attack occurred two days prior and was relieved with an inhaler. *Id*. She used to smoke cigarettes, but quit six months earlier. (Tr. 138.) According to Dr. Paras, Ward walked normally with no assistive device, was in no acute cardiorespiratory distress, her lungs were clear without rhonchi or wheezes, her strength was good, and her ranges of motion were normal or nearly normal. (Tr. 141-43.) Dr. Paras opined that Ward would be limited in performing work-related physical activities by "her easy fatigability and exertional dyspnea." (Tr. 139.)

On April 6, 2006, Ward was transported to the ER with complaints of shortness of breath and left-sided abdominal pain. (Tr. 229-237.) She was given medication, which resulted in sufficient improvement to allow for her discharge. *Id*.

On January 18, 2007, Ward reported to the ER complaining of shortness of breath. (Tr. 220-29.) She was diagnosed with bronchitis, and prescribed an antibiotic. (Tr. 228.)

On April 7, 2007, Ward returned to the ER with complaints of a sore throat and shortness

3

of breath. (Tr. 206-219.) She was diagnosed with Strep throat and asthma (Tr. 209, 216.)

On April 26, 2007, Ward went to the ER complaining of an asthma attack. (Tr. 196-205.) She stated that she had run out of her Albuterol inhaler earlier that day. (Tr. 197.)

On June 13, 2007, Ward was seen at the ER complaining of difficult breathing. (Tr. 186-195.) A chest X-ray revealed mild cardiomegaly and she was diagnosed with "asthmatic bronchitis." (Tr. 189, 194.)

On July 30, 2007, Ward was seen at University Hospitals of Cleveland for shortness of breath. (Tr. 370-78.) She improved after being given medication and was discharged. *Id*.

On September 11, 2007, she went to the hospital complaining of a sudden onset of shortness of breath and upper back pain. (Tr. 368.) Ward was diagnosed with an umbilical hernia and underwent surgery on October 1, 2007. (Tr. 365.)

On January 15, 2008, Ward went to the hospital complaining about her asthma. (Tr. 441-44.) At the time, she complained of lingering abdominal pain since her hernia surgery. (Tr. 441.) She was medicated and discharged in an improved condition. *Id*.

On March 6, 2008, Ward was admitted to the hospital complaining of shortness of breath and coughing. (Tr. 437-40.) She was diagnosed with anemia secondary to menorrhagia. (Tr. 438.)

On September 5, 2007, occupational therapist Jody Wolfe, OTR/L, performed a functional capacity evaluation. (Tr. 445-59.) Wolfe noted that Ward had given "sub-maximal effort, " which the therapist explained did not imply intent but did suggest that Ward could do more physically at times than was demonstrated during this testing day. (Tr. 445, 455.) Ward walked with a normal but slowed gait, sat and stood with a normal posture, had an

4

unlimited tolerance for sitting, could stand for at least ten minutes, lift and carry ten pounds, and had adequate upper extremity strength and coordination to perform most work tasks. (Tr. 445-46, 448-49, 458.) However, due to restrictions imposed by her asthma, Wolfe opined that Ward "barely qualifies for a sedentary job" and that "the feasibility of securing and maintaining a sedentary level job in a competitive work environment is questionable." (Tr. 446.) According to Wolfe, Ward may benefit from physical therapy to develop an exercise program so that she could increase her endurance while performing job-related tasks. (Tr. 446, 458.)

2. *Mental Impairments*

On September 13, 2005, Jitendra B. Cupala, M.D., performed a psychiatric evaluation of Ward. (Tr. 358-60.) Dr. Cupala noted that Ward was laid off from her job as a housekeeper due to the frequency of her medical appointments and was on unemployment for the past six months. (Tr. 359.) She was cooperative during the interview and exhibited relevant and coherent speech. *Id*. She was oriented to time and place, and her memory was intact. *Id*. She had no hallucinations, delusions, or suicidal ideation. *Id*. She had average intelligence, could name the Presidents in reverse order, calculate serial sevens, and give abstract meanings to proverbs. *Id*. Her insight and judgment were good. *Id*. She was ascribed a Global Assessment of Functioning (GAF) score of 60.[1] Dr. Cupala diagnosed bipolar disorder, mixed, with OCD symptoms and prescribed Lexapro and Depakote. (Tr. 359-60.)

On September 27, 2005, Dr. Cupala increased Ward's medications. (Tr. 357.)

---

[1] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

5

On October 25, 2005, Ward told Dr. Cupala that she was only taking one Depakote instead of two. (Tr. 355.) According to Dr. Cupala, Ward's behavior was controlled and she had no side effects from her medications. *Id*. He ascribed her a GAF score of 55. Dr. Cupala also completed a daily activities questionnaire. (Tr. 132-34.) Ward had good flow of conversation and coherent, relevant speech. (Tr. 132.) Her mood was anxious, and she displayed anger and irritability. *Id*. She had no thinking disorders, and she was oriented in all spheres. *Id*. Her memory was intact and she had average intelligence. *Id*. She had been sober for seven and a half years and attended Alcoholics Anonymous (AA). *Id*. She had bipolar disorder for more than three years – possibly since she was fifteen years old. (Tr. 133.) According to Dr. Cupala, Ward responded well to her medications and her prognosis was good. *Id*. She was able to remember, understand, and follow directions, but had difficulty concentrating, and had great difficulty with social interaction. *Id*. She was able to adapt, but was unable to handle the pressure of work settings or sustain routine, repetitive tasks. *Id*.

On October 25, 2005, Regina Franklin, a case manager, reported that Ward was unemployed and had been diagnosed with major depressive disorder. (Tr. 135-36.) She attended sobriety meetings weekly and had been sober for seven years. *Id*. Ward was able to prepare basic meals, could physically perform daily chores, and her personal hygiene was good. (Tr. 136.) She was "adjusting to basic living in spite of stress." (Tr. 135.)

On November 30, 2005, psychologist Sally Felker, Ph.D., conducted a clinical interview and mental status examination of Ward. (Tr. 144-47.) Ward told Dr. Felker that she dropped out of high school in tenth grade due to pregnancy. (Tr. 144.) Her longest term of employment occurred between 2000 and 2003 when she worked as a cashier at a gas station, but

was terminated due to an accusation of theft. (Tr. 144.) She also worked as a housekeeper for about a year. *Id*. Ward had a history abusing crack cocaine and alcohol, but had been sober for seven and a half years. (Tr. 145.) She regularly attends AA meetings. *Id*. She had never been hospitalized for psychiatric treatment. *Id*. She had a neat appearance and cooperative manner, and her grooming and hygiene were adequate. *Id*. She had normal speech that was organized and goal-directed, and she was able to respond to questions adequately. *Id*. She told Dr. Felker that she was not very depressed at that time, but had problems with irritability and mania. *Id*. However, at times she felt intensely irritated with little provocation or reason. *Id*. Ward had no delusions, paranoia, grandiose thoughts, or hallucinations. (Tr. 146.) She was oriented to person, place, and time, and had fair concentration. *Id*. She completed serial seven calculations at a relatively slow pace, and her insight and judgment were fair. *Id*. Her daily activities included helping her six-year-old son get ready for school, meditating, writing in her diary, attending weekly AA meetings, helping her son with homework, giving her son a bath and putting him to bed, attending church twice a month, and maintaining friendships. *Id*. Dr. Felker diagnosed Ward with bipolar disorder NOS. (Tr. 147.) She opined that Ward had a mild to possibly moderate impairment of her ability to concentrate and attend to tasks. *Id*. While her ability to understand and follow instructions was not impaired, her capacity to carry out tasks was moderately restricted due to depressive symptoms and limited motivation. *Id*. She was also moderately impaired in her ability to relate to others and deal with the general public. *Id*. Her ability to relate to work peers and supervisors, and to tolerate the stressors of employment, was significantly impacted by her bipolar disorder. *Id*. Dr. Felker ascribed Ward a GAF score of

50.[2]

On December 6, 2005, Ward saw Dr. Cupala and reported a having some mood swings, anger, and irritability. (Tr. 353.) Dr. Cupala increased her dosage of Depakote. *Id*. Dr. Cupala reported that Ward was in good spirits with no evidence of anxiety, depression, mania, or psychosis. *Id*. Her behavior was controlled, her affect was normal and she was not suicidal. *Id*.

On December 26, 2005, Joan Williams[3] reviewed Ward's medical records and completed a Psychiatric Review Technique form. (Tr. 167-81.) Williams indicated that Ward had a severe mental impairment that was not expected to last twelve months, and indicated that her impairment was evaluated under Listing § 12.04 for affective disorders – specifically for bipolar disorder. (Tr. 167, 170.) Williams found that Ward had a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. 177.) Williams noted that the record contained no evidence of inpatient psychological treatment or partial hospitalization and that all of Ward's mental health documentation emerged following the filing of her disability claim (Tr. 179.) She also noted that Ward was benefitting from treatment and that the duration requirement for her mental condition had not been satisfied. *Id*.

On June 6, 2006, Ward saw Dr. Cupala, who noted that her last appointment was in

---

[2] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning. A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job. *See Diagnostic and Statistical Manual of Mental Disorders*, *supra*, at 34.

[3] Ms. Williams's credentials are not listed on the form.

February 2006.  (Tr. 351.)  Ward had run out of her medications and complained of symptoms of depression, mood swings, anger, and irritability.  *Id*.  She last took Depakote three weeks earlier and had reduced her dosage in order to make the medicine last longer.  *Id*.  Dr. Cupala noted her non-compliance.  *Id*.  She was ascribed a GAF score of 55.  *Id*.

On August 1, 2006, Ward was seen by Dr. Cupala, though she failed to go for a blood test as instructed.  (Tr. 349.)  She told Dr. Cupala that she had been more compliant with her medications.  *Id*.  Her diagnosis remained unchanged.  *Id*.

On September 5, 2006, Ward visited Dr. Cupala for a follow-up.  (Tr. 347.)  Ward had stopped taking her prescribed Prozac a month earlier because she ran out.  *Id*.  She continued to experience symptoms of anger and irritability.  *Id*.  Dr. Cupala renewed her prescriptions for Depakote and Prozac.  *Id*.

On December 5, 2006, Dr. Cupala reported that Ward had been doing very well on her medications when she took them as directed, but noted that she ran out of her medications because she could not keep her appointments.  (Tr. 343.)  Dr. Cupala noted that her anger, irritability, and depression symptoms were caused by her non-compliance.  *Id*.  Ward was diagnosed with bipolar disorder in "fairly good remission."  *Id*.  The record indicates that she missed two appointments in January of 2007.  *Id*.

On May 8, 2007, Ward was seen by Dr. Cupala for a medication follow-up.  (Tr. 341.)  Her medication dosages were increased.  *Id*.  Her bipolar disorder was no longer noted to be in remission.  *Id*.  She missed her next appointment scheduled for June 19, 2007.  (Tr. 343).

On July 10, 2007, Dr. Cupala reported that Ward was having problems with anger, irritability, sleep, and mood swings.  (Tr. 339.)  Ward stated that she had not taken any

9

medications for more than a week because she ran out of her medications due to a missed appointment. *Id*. She denied any side effects from the medications. *Id*. Dr. Cupala continued to prescribe Depakote and Prozac. *Id*. On the same day, Dr. Cupala completed a mental functional capacity form. (Tr. 362-63.) Dr. Cupala indicated that Ward had fair abilities to follow work rules, use judgment, maintain concentration and attention for extended periods, respond to changes in a routine setting and maintain regular attendance and punctuality. (Tr. 362.) She had poor or no ability to deal with the public, relate to co-workers, interact with a supervisor, function independently without special supervision, or work in coordination with others. *Id*. She had good abilities to understand, remember, and carry out simple, detailed, and/or complex job instructions. (Tr. 363.) She had good abilities to maintain her appearance, and fair abilities to socialize, behave in an emotionally stable manner, and relate predictably in social situations. *Id*. She also had good abilities to manage her funds and schedules, and to leave home on her own. *Id*.

On August 7, 2007, Ward told Dr. Cupala that she was doing very well with her current medications, and was in good spirits. (Tr. 400.) She had no signs of anxiety, depression, psychosis, or mania, and no side effects from her medications. *Id*. She maintained her hygiene and her behavior was controlled. *Id*. Unlike before, she had no complaints regarding mood swings, anger, or irritability. *Id*. She still had not gone for a blood test, but promised to do so that week. *Id*. The record indicates that Ward missed her next six scheduled appointments. *Id*.

On February 5, 2008, Ward was seen by Dr. Cupala, who noted that she had missed so many appointments that her case was closed. (Tr. 397.) Dr. Cupala noted that Ward last received prescriptions for Depakote and Prozac in October 2007. *Id*. In the interim, Ward had

10

been taking Valium, which had been prescribed for her mother. *Id*. She told Dr. Cupala that she was becoming more irritable, hyper, impatient, and stressed. *Id*. She did not complain of manic episodes, but she had depression with mood swings and racing thoughts. *Id*. Dr. Cupala noted that Ward had been very irregular in keeping her appointments, had missed her appointments several times in the past, and had been non-compliant with her medications. *Id*. Ward said she wanted to try other medications, as she felt the Depakote and Prozac did not help her. *Id*. She was ascribed a GAF score of 60. (Tr. 399.)

### *Hearing Testimony*

At the hearing, Ward testified to the following:

- She was raising a nine-year old child. (Tr. 482.)

- She had not been hospitalized in the past twelve months for any psychiatric crisis. *Id*.

- She was taking Depakote, Prozac and Seroquelm, which helped "sometimes." (Tr. 485.)

- She has tried weaning herself off of her medications because of "embarrassment." (487.)

- She was unable to get out of bed 3 or 4 days per week due to depression. (Tr. 488.)

- She attended church but sat in the back to avoid interacting with others. (Tr. 489.)

- She could only walk short distances due to her asthma. (Tr. 493.)

The VE testified as follows:

- Ward's past job as a housekeeper is medium, unskilled work, but was performed at the light exertional level according to Ward's description. (Tr. 496.) Ward's work as a "cashier/checker," is classified as light, semi-skilled work, but was performed at the medium exertional level according to her description. *Id*.

- The ALJ posed the following hypothetical to the VE: "[the hypothetical person] [w]ould have a full light exertional capability. Full. That has to do with lift, carry, push, pull, sit, stand and walk. And in regards to postural or manipulation limitations there are none. In regards to environment limitations there should be no high concentration of dust, fumes and gases. In regards to mental limitations these nonexertional limitations should

11

      apply. The work should not be complex. It should never involve bargaining, mediation or arbitration. It should be fairly simple [sic] learned after perhaps you know, a week or two on the job or maybe even less. This should basically be repetitive. Simple, repetitive task. The work should be low stress and let me define low stress. Low stress would mean fairly low production quotas. In other words, not no production quotas. And another way of explaining that is there should never be a high production pace. And lastly, her interaction with the general public and coworkers and supervisors should be lessened. Not none. It should be lessened." (Tr. 496-97.)

- The VE stated that such a person could not perform Ward's past relevant work, but identified a number of jobs in the national economy which such a person could perform. (Tr. 497-502.)

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[4] A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve

---

[4] The entire five-step process entails the following: First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Ward was insured on her alleged disability onset date, November 19, 2004 and remained insured through December 31, 2009. (Tr. 15.) Therefore, in order to be entitled to POD and DIB, Ward must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits under the Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV. Summary of Commissioner's Decision

The ALJ found Ward established a medically determinable, severe impairment, due to asthma and bipolar disorder. (Tr. 17.) However, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Ward is unable to perform her past work activities, but has a Residual Functional Capacity ("RFC") for a limited range of light work. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Ward is not disabled.

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003)

("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI. Analysis

### *Ward's Credibility*

Ward argues that the ALJ erred in his assessment of her credibility. (Pl.'s Br. at 13-15.) Specifically, she asserts that his analysis was perfunctory and based on unwarranted assumptions.

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment. Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." *See* SSR 96-7p. If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. *Id.* Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers

the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96-7p, Purpose section; *see also Felisky v. Bowen,* 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"); *Cross*, 373 F. Supp. 2d at 733 (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* SSR 96-7p, Purpose. Beyond medical evidence, there are seven factors that the ALJ should consider.[5] The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ was conscious of his responsibility to conduct a credibility analysis. (Tr. 19-20.) He found that Ward's medically determinable impairments could reasonably be expected to produce her alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of her symptoms were not credible. (Tr. 20.) After analyzing some of the medical evidence of record, the ALJ concluded as follows:

---

[5] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p, Introduction; *see also Cross v. Comm'r of Soc. Sec.*, 375 F. Supp. 2d 724, 732 (N.D. Ohio 2005).

15

> Claimant's complaints are exaggerated. Her noncompliance with appointments and medication cannot be overlooked. She claims her medications make her feel like a zombie, but she failed to report side effects of medication to Dr. Cupala. His records do not note that she had days where she did not get out of bed.

(Tr. 22.)

Ward takes issue with the ALJ's finding that her failure to report her inability to get out of bed and feeling like a "zombie" to Dr. Cupala undermined her credibility. (Pl.'s Br. at 13-14.) She argues that she did not experience this feeling until she started seeing a different doctor who increased her medication and that she had stopped seeing Dr. Cupala about a month before the hearing. (Tr. 490-91.) While the "zombie" comment may have been made only after Ward began treating with a different psychiatrist, the ALJ's general reasoning remains still valid. Ward also testified that she lost her last job in August of 2005 because she could not get out of bed and depression. (Tr. 17, 483, 487.) Ward first saw Dr. Cupala barely a month after her last job ended and continued to see him until a month before the hearing. It was not unreasonable for the ALJ to conclude that the lack of complaints about being unable to get out of bed over that span rendered her testimony less than credible.

Ward also has not pointed to any procedural defects in the ALJ's credibility finding. Instead, she argues that the ALJ's finding that she was willfully non-compliant with her treatment is unwarranted. The Court finds that the ALJ's determination was not unreasonable in light of the medical record. He clearly identified the reasons for finding Ward's testimony lacking in credibility. An ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Ward does not identify an error in this finding, but rather argues that he should have come to a different conclusion. As this Court does not conduct a *de novo* review,

her assignment of error is without merit.

*RFC Finding*

Ward also argues that the ALJ erred by finding that Ward could perform a full range of light work and contends that no medical evidence exists in the record to support such a finding. (Pl.'s Br. at 16-19.) First, Ward's contention that the ALJ found that she could perform the full range of light work is inaccurate. The ALJ specifically identified additional environmental limitations, as well as a fair number of non-exertional limitations to accommodate her mental impairments. (Tr. 19.) As such, the ALJ clearly did not find that Ward could perform all work in the light exertional category.[6]

Ward further argues that the ALJ's decision is incompatible with Dr. Paras's opinion. First, RFC is an indication of an individual's work related abilities despite their limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.945(e). As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence. *See* 20 C.F.R. § 416.945(a). Second, while Dr. Paras indicated that Ward's ability to perform work-related physical activities was limited by "her easy fatigability and exertional dyspnea," there is nothing to indicate that this opinion is wholly inconsistent with the limited range of light work RFC finding made by the ALJ, especially considering the additional limitations imposed

---

[6] Notably, during the hearing, Ward's counsel posed additional hypothetical questions to the VE that did *not* alter the ALJ's base RFC of light work. (Tr. 503-07.) Though the Court does not construe this as a concession by Ward that she could perform such work, it is worth noting that no one ever asked the VE whether a person with Ward's capabilities could perform jobs in the national economy if she did not meet all the lifting, walking, standing, and sitting demands of light work.

17

by the ALJ prohibiting exposure to high concentration of dust, fumes and gases. However, Dr. Paras also found that Ward walked normally with no assistive device, was in no acute cardiorespiratory distress, her lungs were clear without rhonchi or wheezes, her strength was good, and her ranges of motion were normal or nearly normal. (Tr. 141-43.) As such, the ALJ found that Dr. Paras's opinion must have been based on Ward's subjective complaints as Dr. Paras's own examination found no problems with Ward's lungs and no problems with ambulation. (Tr. 20, 138.)

Ward also points to the functional capacity evaluation of Jody Wolfe, OTR/L, who opined that Ward barely qualifies for a sedentary level job. (Tr. 446.) The ALJ appears to have given little weight to this opinion because, as indicated by Wolfe, Ward gave "submaximal effort." (Tr. 20.) However, with respect to her physical capabilities, Wolfe also found that Ward walked with a normal but slowed gait, sat and stood with a normal posture, had an unlimited tolerance for sitting, could stand for at least ten minutes, lift and carry ten pounds, and had adequate upper extremity strength and coordination to perform most work tasks. (Tr. 445-46, 448-49, 458.) Ward argues that the ALJ should have interpreted the "submaximal effort" statement differently. Ward apparently misconstrues the substantial evidence standard, which "presupposes that there is a zone of choice within which the [ALJ] can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Williamson v. Apfel*, 1998 U.S. App. LEXIS 30010 at *13 (6${}^{th}$ Cir. 1998) *quoting Mullen*, 800 F.2d at 545. Here, simply because Ward proffers a different interpretation of Wolfe's opinion, the ALJ's conclusion is not thereby rendered unreasonable or untenable.

As such, Ward's second assignment of error is without merit.

### VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner is AFFIRMED and judgment is entered in favor of the defendant.

IT IS SO ORDERED.

s/ Greg White<br>U.S. Magistrate Judge

Date: January 29, 2010